KILGO v. CONTINENTAL CASUALTY COMPANY.

Opinion delivered October 27, 1919.

1. WITNESSES—PRIVILEGED COMMUNICATIONS—LETTER OF FORMER ATTORNEY TO DEFENDANT.—A letter written by plaintiff's attorney to defendant insurance company is admissible in evidence to show that plaintiff's contention as to the insurer's misrepresentations was an afterthought.

2. INSURANCE—RELEASE PROCURED BY FRAUD—NOT VOID, WHEN.—A release procured by an accident company from the insured, who had sustained an injury, is not void, although procured by fraud; such release is voidable at the instance of the policy holder, but is binding until avoided.

3. SAME—SAME—SAME—RETURN OF CONSIDERATION.—A release, procured by an accident company, by fraud, is binding, until rescinded by the insured, by returning the consideration or by bringing suit.

4. RELEASE—REPUDIATION FOR FRAUD—TIME.—One who has been induced by fraud to give a release has a reasonable time, after discovery of the fraud, to repudiate the same; what is a reasonable time is a jury question.

Appeal from Pulaski Circuit Court, Second Division; *Guy Fulk,* Judge; affirmed.

*Emerson, Donham & Shepherd,* for appellant.

1. The court erred in permitting T. M. Mehaffy to testify as to communications between him and plaintiff. These communications between a client and his attorney were privileged and incompetent without the consent of plaintiff. Kirby's Digest, § 3095; 33 Ark. 774. The court erroneously adopted the view or theory that plaintiff communicated the facts to Colonel Mehaffy for the

purpose of having him communicate them to the defendant company. This view or theory is not warranted by the evidence. The testimony shows that plaintiff employed Mehaffy as his attorney and placed his case in his hands for whatever action he saw fit to take. He did not ask him to write the letter and denies that Colonel Mehaffy informed him that defendant claimed it held a release for any claim under the policy sued upon. The letter was privileged and the testimony incompetent. Cases *supra.*

2. Plaintiff did not have a fair and impartial trial, because one of the jurors, A. J. Graham, was a brother-in-law of Colonel Mehaffy, and under the peculiar circumstances here was biased against plaintiff and he did not know this until the jury had retired.

3. The court erred in giving defendant's instruction No. 4. If plaintiff was defrauded as he alleged he had three years after discovering the fraud within which to bring suit. Kirby's Digest, § 5064; 92 Ark. 618. The suit was filed in time. 20 Cyc. 94; 12 R. C. L. 412; 43 Atl. Rep. 1052; 108 N. W. 884; 122 N. E. 826; 93 S. W. 124; 187 *Id.* 681; 163 *Id.* 1038; 83 Ark. 575.

4. Money paid as a consideration for a release from liability under a policy of insurance obtained by fraud does not have to be returned as a condition precedent to suit, but the amount may be credited on the judgment. 83 Ark. 575; 103 *Id.* 341.

Said instruction No. 4 is also erroneous in that it is inconsistent with our statute. Kirby's Digest, § 4380. Also because it told the jury that before plaintiff could recover he must have offered to return the money paid him or brought suit within a reasonable time after discovering that defendant claimed that the release was in full settlement of all claims. 83 Ark. 575; 103 *Id.* 341; 73 *Id.* 42; 81 *Id.* 264.

*Manton Maverick,* of Chicago, Ill., and *Cockrill & Armistead,* for appellee.

1. There was no error in permitting T. M. Mehaffy to testify as to communications with plaintiff while he was

his attorney. 112 Ark. 277; 40 Cyc. 2375. The letter was not privileged. 43 Ark. 307, 316.

2. There was no error in giving instruction No. 4 complained of. It correctly states the law. 115 Ark. 238-249; 24 A. & E. Enc. 320; 71 Fed. 21, 27; 34 Cyc. 1065; 13 Ill. App. 206; 64 Fed. 293; 93 U. S. 55-63; 141 *Id.* 429; 92 S. W. 855; 30 Atl. 308; 10 S. W. 403.

SMITH, J. On January 22, 1914, appellee, hereinafter referred to as the company, issued to appellant, hereinafter referred to as plaintiff, a policy of insurance which provided that if plaintiff should receive an injury through external, violent and purely accidental means, rendering him unable to perform any labor, the company would pay him an indemnity of fifteen dollars per week during the time he was so disabled but not to exceed one hundred and four consecutive weeks.

Plaintiff offered testimony to the effect that on September 19, 1915, and while the policy was in full force, he sustained an injury of the kind covered by the policy, and as a result of said injury was unable to perform labor of any kind for more than one hundred and four consecutive weeks subsequent to the accident. The testimony was conflicting as to the length of time during which the disability continued, but before it had continued for as much as twenty-four weeks and at a time when, according to the company, plaintiff had fully recovered, a settlement was made for that period and the sum of $360 paid and the following release was executed by the plaintiff:

"Received of the Continental Casualty Company the sum of $360 for the following purposes: In full compromise, payment, satisfaction, discharge and release of any and all claims that I myself, my heirs, executors, administrators, assigns, or beneficiaries, now have or may hereafter have against said company under policy No. 2,979,645, for or on account of all injuries sustained by me on or about September 19, 1915, or any loss that may hereafter result from said injuries."

Plaintiff testified that he was an illiterate man and could write nothing but his name, and that he signed the release under the representation that it was a receipt for the amount due him for the said twenty-four weeks, and that the company's agent who made the settlement with him stated that if he had not fully recovered by the end of the twenty-four weeks the accruing payments would thereafter be made as provided by the policy. The testimony on this point was in irreconcilable conflict.

After the expiration of the twenty-four weeks plaintiff demanded additional payments, which were refused by the company upon the ground that the claim had been settled in full, and in March, 1916, plaintiff took the policy and the correspondence in regard thereto to Mr. Mehaffy, an attorney in Little Rock, and directed the attorney to take the matter up with the company. Mr. Mehaffy wrote the company under date of March 15, and received in reply a letter dated March 18, 1916, in which the release was quoted in full and the statement there made that a full and final disposition of the claim had been made with the plaintiff and any additional liability denied.

Thereafter no further action was taken until August 22, 1918, when this suit was brought.

Mr. Mehaffy was called as a witness by the company and, over plaintiff's objection, was required to read in evidence his letter to the company. The objection made and now insisted upon was that the letter was a privileged communication. It reads as follows: "Gentlemen: We represent Mr. Wm. M. Kilgo who was a brakeman for the Chicago, Rock Island & Pacific Railway Company and who had a policy in your company. He was injured as you know, and a settlement was made with him by your representative. Your representative, however, at the time, according to Mr. Kilgo's statement, represented that the policy was void, and that they did not owe him anything and thereby induced the settlement which was made. We are writing to know if you are willing to

take the matter up and adjust it or, if you claim that your settlement made in the manner that it was is final.

"Won't you kindly let us hear from you?

"Yours very truly."

At the request of plaintiff the court gave five instructions presenting the law applicable to his theory of the case; but over his objection and exception gave an instruction numbered 4, which reads as follows:

"IV.  You are instructed that a person who was fraudulently induced to sign a release or make a settlement in full can waive his right to rescind the release or settlement and in that way be bound and barred by the release.  The duty devolved on him to rescind within a reasonable time after discovery of the fraud, and a failure to do so defeats a recovery.  To accomplish a rescission, plaintiff must have offered to return the money paid him, or brought his suit without offering to do so, within a reasonable time after discovering that defendant claimed that said release was in full settlement of all claims.  What is a reasonable time under the particular facts and circumstances is for you to determine."

Other assignments of error are argued, but we do not consider it necessary to discuss them.

There was a verdict and judgment for the company, and plaintiff has appealed.

(1)  We think no error was committed in requiring Mr. Mehaffy to identify and read in evidence the letter set out above.  The letter was written at the suggestion and for the benefit of the plaintiff, and the information there contained was intended when given by him to the attorney to be communicated to a third person.  The rule applicable in such cases was stated by this court in the case of *Vittitow* v. *Burnett*, 112 Ark. 277, where it was said: "The object of the rule (section 3095 of Kirby's Digest, which provides that an attorney shall be incompetent to testify concerning any communication made to him by his client in that relation, or his advice thereof, without the client's consent) is to secure freedom in communication between attorney and client in order that the former

may act with full understanding of the matters in which he is employed; but, as the rule tends to prevent a full disclosure of the truth, it should be strictly construed and limited to cases falling within the principle on which it is based. 40 Cyc. 2361, 2362. There is no privilege as to statements by a client to his attorney for communication to a third person. 40 Cyc. 2375. Vittitow employed Carpenter to assist him in purchasing the land from Burnett, and directed him to write to Burnett, making him an offer for the land. It was intended that the matters embraced in the letter written by Carpenter to Burnett should be communicated to Burnett in order to be acted upon. Therefore, the letter falls within the rule that communications made to an attorney by a client and intended by the latter to be imparted to a third party for the benefit of the client do not come within the rule laid down in the statute.''·

The difficult question in the case is whether or not instruction numbered 4 correctly declares the law.

In the case of *Bowden v. Spellman,* 59 Ark. 259, it was said: ''Our own court has long ago announced the rule that a party defrauded must, 'within a reasonable time after the fraud is discovered, elect to rescind, if such be his purpose. And he can only rescind by returning, or offering to return, whatever he may have received, under the contract, of value to either party.' *Desha* v. *Robinson,* 17 Ark. 240; *Seaborn* v. *Sutherland, Id.* 603; *Bellows* v. *Cheek,* 20 *Id.* 438; *Hynson* v. *Dunn,* 5 *Id.* 395; *Davis* v. *Tarwater,* 15 Ark. 286; *Johnson* v. *Walker,* 25 *Id.* 204; *Benjamin* v. *Hobb,* 31 *Id.* 151; *Merritt* v. *Robinson,* 35 *Id.* 483; *Hanger* v. *Evans,* 38 *Id.* 334; *Berman* v. *Woods,* 38 *Id.* 351.''

The authority of that case and the correctness of the declaration of law quoted has not been questioned insofar as it announces the general rule applicable to a party seeking to rescind a contract for fraud practiced in its procurement. But certain exceptions to the rule have been recognized, and in the case of the *Pekin Cooperage Co.* v. *Gibbs,* 114 Ark. 559, we quoted and reviewed our

own cases dealing with exceptions to this rule with special reference to suits brought upon causes of action which had previously been settled and released without first returning the sums paid by way of consideration for the releases. We there said: "A discussion of the same principle is found in 34 Cyc., p. 1071, in the article on the subject of Releases, and in the discussion of the necessity for the restoration of the consideration as a condition precedent to attacking a release, it was there said: 'It is generally held that if a person enters into a release and afterward seeks to avoid the effect of it on any ground that will entitle him to rescind it, he must first restore what he has received, although there is some authority to the effect that such restoration or tender need not be made, and that it is sufficient to credit the amount paid with interest on the judgment recovered.'

"After this statement of the rule there follows, on page 1073, a statement of the exceptions to it, where it was said:

" 'When a releasor who is himself free from negligence is deceived as to the nature of the instrument executed by him, as, for instance, where the release is represented to be a receipt for a gratuity, or for expense, for loss of time, for wages, to indicate absence of any ill-will, or that it was a partial release, as that it was a release for damages to clothing or property and in fact included personal injuries, the consideration received need not be restored or tendered. Likewise, according to some cases, where the releasor was mentally incapable of executing the release. Nor is a releasor required to return that which in any event he would be entitled to retain, either by virtue of the release itself or of the original liability, but credit must be given on the judgment. Furthermore, the releasor is entitled to retain the consideration received by him from the releasee by virtue of a transaction independent of the release. It has been held that, if the releasor be an infant, he may repudiate his release without restoring or tendering the consideration. * * *'."

But in none of the cases there collected has it ever been said that the right of rescission may be exercised at any time before the bar of the statute of limitations has fallen against the original cause of action.

Plaintiff cites the case of *Conditt* v. *Holden,* 92 Ark. 618, and similar cases, to the effect that where there has been a fraudulent concealment of the existence of a cause of action the statute of limitations does not begin to run until the discovery of the fraud; and he also cites authorities to the effect that delay short of the period fixed by the statute of limitations will not defeat the right to recover damages in an action of deceit, and he argues, therefore, that he had the full time in which to sue that he would have had had the release not been executed. In other words, that he might sue at any time before his cause of action on the policy would be barred and that as that period was three years and three years had not elapsed between the time of executing the release and instituting this suit, he has the right to maintain the present action.

(2-3) Answering this contention, it may be said that this suit is not one for deceit, nor has there been any concealment of the existence of a cause of action. The suit is predicated upon a contract of insurance and presumptively the right to maintain that suit did not exist because that cause of action had been compromised and settled. The lease was not void, even though it may have been obtained by fraud practiced in its procurement upon the plaintiff. It was voidable at his instance, but was binding until avoided. Under the decisions of this court he was not required to return the consideration paid for its execution if it had in fact been procured by fraud; but, until it has been rescinded by returning the consideration or by bringing suit, it bound him. The instruction complained of told the jury that a rescission could have been accomplished by a return of the money paid plaintiff, or by the institution of a suit without an offer to return the money, provided that action was taken within a reasonable time after the discovery of the fraud

—and further, that what was a reasonable time under the facts and circumstances of the case was a question for the jury to determine.

(4)    That instruction finds full support in the language quoted from the case of *Bowden* v. *Spellman, supra.* There are exceptions to the rule there announced that the consideration must be returned upon the rescission of a contract and those exceptions are shown in the cases cited in the case of *Pekin Cooperage Co.* v. *Gibbs, supra,* but we have not decided that one must not rescind a contract of settlement procured by fraud within a reasonable time after the discovery of the fraud. When one has made a contract compromising his cause of action, he must in some manner repudiate it, and he has a reasonable time after the discovery of the fraud in which to take that action, and as to what is a reasonable time is a question of fact to be determined by the jury upon a consideration of the circumstances of the particular case—as the jury was here told.

In the case of *Missouri Pacific Ry. Co.* v. *Brazil,* 10 S. W. 403, a passenger injured on a train executed a release of his claim for damages for the sum of five hundred dollars. In his complaint for damages he anticipated the fact that the release executed by him would be pleaded in bar of his suit, so he recited the circumstances under which it had been obtained, showing that it had been procured through fraud and undue influence. Upon that issue the railway company asked the following instruction:

"No. 4.    If you find from the evidence that plaintiff was insane when he signed the release, or that the release was invalid under the rules of law given you by the court, but further find from the evidence that the plaintiff, after he became conscious and was informed of the release, and that he had released defendant from all claims of damage for $500 paid to him, continued to use the money, or if he had used it in the payment of debts, and did not promptly, or within a reasonable time after he became conscious, repudiate or disaffirm the contract, then you will find for defendants."

It will be observed that this instruction imposed exactions not contained in the instruction under review, and we are not, therefore, called upon to approve it in its entirety; but the Supreme Court of Texas held that it should have been given as requested and in so holding said: "Contracts only voidable are only obligatory until in some manner repudiated or annulled, and may, at any time, be ratified, and thereby the right to annul them be lost. That there was an express ratification of the contract, evidenced by the release, is not claimed, and the question before us is, were there facts in evidence from which ratification might be legally inferred? If from the evidence the jury might have found that, subsequently to the execution of the release, appellee had mental capacity sufficient to comprehend the nature, purpose, and effect of the contract evidenced by it, and knew that he had executed it, that the money in his possession came through it, and with this knowledge, without repudiating the contract, used the money, may ratification be legally inferred from these facts, taken with appellee's surroundings? If so, a charge similar to that numbered 4 should have been given. In passing on this question it must be remembered that the contract was executed, continuing in its character or force until repudiated, and therefore one not requiring any express assent on the part of appellee, subsequent to the making of the contract, to give it validity. Whether appellee, subsequently to the making of the contract, at the time when he had sufficient mental capacity to have made such a contract not voidable, consented that the contract should stand and be obligatory, may be determined by his acts as well as by declarations of intention. If by his acts, done at a time when he had mental capacity to have made a contract absolutely releasing appellants, appellee clearly evidenced his intention to be bound by the contract he had made, then he ought to be held bound, and no subsequent change of intention ought to affect the rights of the parties. Consent to be bound by a contract only voidable is ratification, however that

consent may be shown. Ratification of a voidable contract, once made, cannot be recalled. Many contracts made by infants are held to be voidable, and so, upon the presumption of want of sufficient mental capacity to make contracts absolutely binding, are contracts made by adults; and the same rules in reference to the evidence of ratification of contracts made by minors apply to the ratification of contracts made by persons laboring under mental derangement. The Supreme Court of Massachusetts, in speaking of the evidence sufficient to show the ratification of a contract made during minority, said: 'If, after coming of age, he retains the property for his own use, or sells, or otherwise disposes of it, such detention, use, or disposition, which can be conscientiously done only on the assumption that the contract of sale was a valid one, and by it the property became his own, is evidence of an intention to affirm the contract from which a ratification may be inferred.' *Boyden* v. *Boyden,* 9 Metc. 521.'' And further that: ''The inquiry in any case in which it is claimed that a voidable contract has been ratified is, has the person whose right it was to annul it, either by word or act, when he had mental capacity sufficient to contract, and knowledge of what he had previously done, evidenced his consent that the contract shall stand? In many cases it has been held that retention of property acquired under a voidable contract, by the person entitled to avoid it, if long continued, would authorize a finding of ratification.''

Many other cases to substantially the same effect are cited in appellee's brief.

A general statement of the law is found in volume 2 of Black on Rescission and Cancellation of Contracts, in the chapter dealing especially with Releases, Compromises, and Settlements, where, at section 397, the author says: ''Though a release may be voidable for fraud or other legally sufficient cause, yet it may be ratified by the releasor, and if this is done, he will afterwards be estopped from repudiating it; and such ratification may

be inferred from long acquiescence in the existing state of affairs, amounting to laches. But ratification presumes knowledge of the facts, and one not informed of the whole of a transaction cannot ratify it."

In addition to the case of *Bowden* v. *Spellman, supra,* another case announcing the duty of one who desires to rescind a cotract procured by fraud is that of *Fitzhugh* v. *Davis,* 46 Ark. 337, and which deals with the question in detail. The third syllabus in that case is as follows: "Where a party desires to rescind a contract for fraud or mistake, he must, upon discovery of the facts, at once announce his purpose and adhere to it. If he be silent and continues to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract as if the fraud or mistake had not occurred." See, also, *Wilson* v. *Strayhorn,* 26 Ark. 28.

We think the instruction given was a correct declaration of the law as applied to the facts of this case.

No prejudicial error appearing, the judgment of the court below is affirmed.

The CHIEF JUSTICE and HUMPHREYS, J., dissent.